2022 IL App (1st) 191084-U

No. 1-19-1084

Order filed August 12, 2022

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| | ) | |
| v. | ) | No. 14 CR 4930 |
| | ) | |
| | ) | Honorable |
| DEVON MCCAULEY, | ) | William G. Lacy and |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judges, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Mikva and Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's convictions for first degree murder over defendant's contention that the State's witnesses' prior inconsistent statements were insufficient to prove him guilty beyond a reasonable doubt.

¶ 2    Following a jury trial, defendant Devon McCauley was convicted of two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2014)) and sentenced to consecutive terms of 22

and 25 years' imprisonment.[1] On appeal, he argues that the State's evidence consisted solely of incredible prior inconsistent statements which witnesses recanted at trial and were insufficient to prove his guilt beyond a reasonable doubt. We affirm.

¶ 3 Defendant was charged by indictment with six counts of first degree murder for shooting and killing Ronald Hayes. Relevant here, count I charged that he intentionally or knowingly shot and killed Hayes (720 ILCS 5/9-1(a)(1) (West 2014)), and count VI charged that he shot and killed Hayes knowing that his act created a strong probability of death or great bodily harm and personally discharged a firearm that proximately caused death (720 ILCS 5/9-1(a)(2) (West 2014)). The State nol-prossed counts III and IV.

¶ 4 At trial, Hayes's mother Cathy Booker testified that she lived in the Chicago Housing Authority (CHA) "ABLA" homes on the 1300 block of West Washburne Avenue. She knew defendant, whom she identified in court, and testified he was nicknamed "Poo Poo." Booker identified him in People's Exhibit No. 6, writing "Poo Poo" above his photo. She also identified Lorraine Rice in the exhibit.

¶ 5 The photograph exhibit is included in the record on appeal, and is a still frame from an elevated camera depicting several people on a sidewalk, including a person wearing blue jeans and a parka with a fur hood and a person wearing brown pants. Over the person wearing blue jeans and a parka with a fur hood are the words "Poo Poo" in blue and "Pooh Pooh" in purple. The person next to "Poo Poo" is wearing a red hat or scarf and is marked "Lorraine" in blue and "LR" in purple.

---

[1] The Honorable William G. Lacy presided over defendant's trial. The Honorable William G. Gamboney presided over proceedings on defendant's motion for new trial and sentencing.

¶ 6    In 2013, another of Booker's sons was charged with the attempted murder of defendant's first cousin. On February 9, 2014, Hayes spent the day shoveling snow in the neighborhood. Just after 4 p.m. that day, Lorraine Rice came to Booker's door. Booker then ran from her home towards Hastings Street, where she found Hayes bleeding from his head. He stopped breathing after she approached.

¶ 7    Rice testified that she lived in the ABLA homes in February 2014. She knew defendant by his nickname and identified him in court and by writing his nickname in purple on People's Exhibit No. 6. She also identified herself in the photo. On February 9, 2014, Rice, Hayes, and others removed snow in the neighborhood. Rice observed defendant in the area and spoke to him. Twenty to twenty-five minutes later, around 4 p.m., Rice heard a gunshot and ran towards it. Hayes lay across the street from where she had seen defendant. Rice ran for Booker.

¶ 8    The State entered a stipulation that a medical examiner would testify he examined Hayes's body and determined Hayes died by homicide from gunshot wounds to his head and shoulder.

¶ 9    Tevin Smith, nicknamed "Big Daddy," testified that he was convicted of aggravated unlawful use of a weapon in 2012. He was in custody at the time of trial for contempt of court after failing to appear in this case. He did not want to testify.

¶ 10    Smith grew up in the ABLA homes with defendant, whom he identified in court. The afternoon of February 9, 2014, he was walking on Hastings and encountered defendant. He observed Hayes shoveling and salting. Around 4 p.m., he was around the same area but did not know if he saw Hayes, as he had his head down and was speaking on his phone.

¶ 11    On February 12, 2014, detectives transported Smith to the police station, where he agreed to speak with an assistant state's attorney (ASA). He denied that his mother drove him. He initially

testified that he consented to give a videotaped statement but then denied that he consented. The State published clips of his video statement. Smith briefly refused to testify but subsequently continued. He denied observing Hayes walk past defendant and defendant raising his arm. He denied stating on the video that defendant shot Hayes in the head. He testified that he heard shots and ran.

¶ 12 Smith testified that the police manipulated him into giving the answers depicted in his videotaped statement. They had searched for him at his mother's, girlfriend's, and cousin's homes. He told the police he did not know what happened but when they told him his mother would lose her job, he repeated what they told him to say.

¶ 13 On cross-examination, Smith testified he was on probation for something other than his 2012 unlawful use of a weapon conviction when he went to the police station. Police called him and told him witnesses identified him as being near Hayes when Hayes was shot. They told him defendant was in custody and identified Smith as the shooter. Smith spoke to police for eight or nine hours before the videotaped interview. One of the police officers who forced him into giving the answers was present during the videotaped interview. Smith identified himself in People's Exhibit No. 6 as the person wearing brown pants. On redirect examination, Smith testified he did not know who shot Hayes but it was not defendant.

¶ 14 Chicago police sergeant David Hickey testified that he was a detective in February 2014. On February 12, 2014, Smith came to the police station on his own, although officers had previously gone to his home to locate him.

¶ 15 ASA Joseph Hodal testified that he met with Smith at the police station. Smith agreed to speak, stated he was at the police station voluntarily, and told Hodal what he observed on February

9, 2014. Hodal did not recall speaking with Smith alone, but thought he "probably" did. Smith agreed to a videotaped statement, and Hodal believed his answers in the statement were not coerced or rehearsed.

¶ 16    The State published Smith's entire videotaped statement, which is included in the record on appeal. In the statement, Smith tells Hodal and Hickey that, around 4 p.m. on February 9, 2014, he was around Hastings with defendant and Hayes. He identifies himself and defendant on a photo of the area, stating he is wearing khaki pants and defendant is wearing a fur hood. Smith was on the phone. Hayes walked past defendant and then Smith. Defendant then "slid" around Smith, raised his arm with his hand in his sleeve, and shot Hayes in the head one time. Smith did not see a firearm. Hayes was "dead standing up." Smith's voice breaks slightly as he describes how Hayes, who was tall, took a while to fall. Defendant fired more shots when Hayes fell. Smith stood for three to five seconds, then he and defendant ran in opposite directions. Smith heard a total of four shots.

¶ 17    On the recording, Smith states that he came to the police station on his own, driven by his mother, and is speaking voluntarily because Hayes did not have to die. He initially denies that the shooting was for "no reason," but then agrees that defendant had no reason to shoot Hayes. Smith agrees the detectives had treated him "okay," and he was not speaking because of force, threats, or promises. He had not been handcuffed and was given food and drink.

¶ 18    Rice's son, Dwayne Bolden, testified that he had a 2015 residential burglary conviction. He had been arrested for not complying with a subpoena in this case and did not want to testify. He knew defendant and identified him in court. Around 4 p.m. on February 9, 2014, Bolden was shoveling show on Hastings with Hayes.

¶ 19    Asked about the events of that day, Bolden alternately stated he did not remember them and attempted to "plead the Fifth," but ultimately answered the State's questions. He did not recall seeing defendant and Smith or seeing Hayes get shot. He heard a shot and ran. At the time, he did not know who had been shot.

¶ 20    On February 10, 2014, detectives transported Bolden to the police station. They forced him to enter, grabbing his arm and threatening a probation violation so he would not see his sick mother again. They searched him and discovered a tobacco grinder and marijuana in his pocket. The detectives told him to say that he saw defendant raise his arm and shoot Hayes, and to repeat that story to the grand jury. While at the police station, Bolden was not allowed to use the bathroom, eat, or drink.

¶ 21    After meeting with the detectives, Bolden spoke with an ASA and did not consent to a videotaped statement. The State published clips of a video recording and Bolden identified himself and agreed the video depicted him answering an ASA's questions. He admitted giving some answers but did not recall giving others. Because police officers had told him that he would remain in their custody when the ASA left, he told the ASA the police had treated him well.

¶ 22    Bolden identified People's Exhibit No. 51 as a photograph he was shown by the ASA. He acknowledged signing the photo but denied that he marked the photograph. The photo is included in the record on appeal and is the same image depicted in People's Exhibit No. 6. It is signed by Bolden and dated February 11, 2014. The person with a fur hooded-parka and blue jeans is marked "P," a person in brown pants is marked "B," and a person with a red hat or scarf is marked "M." Bolden testified the person with a "P" was defendant but did not recall who the others were.

¶ 23    On March 13, 2014, Bolden appeared before the grand jury. The police waited outside the courtroom. He acknowledged he told the grand jury that, while salting the ground, he saw two men across the street, one wearing blue jeans and the other wearing brown pants. However, he did not recall giving other answers, including that he observed the man in blue jeans stand near Hayes and raise his arm, heard a loud noise, and saw Hayes fall.

¶ 24    The prosecutor showed Bolden People's Exhibit No. 53 and he testified it was a similar picture as People's Exhibit No. 51, contained his signature, and was dated March 13, 2014. However, he denied that he identified the people in the photograph during the grand jury hearing. The photo is included in the record on appeal and depicts the same image as People's Exhibit No. 6, with defendant, Smith, and Rice identified as "Poo," "Big Daddy," and "Mom," respectively.

¶ 25    On cross-examination, Bolden testified that he was at the police station overnight before the ASA arrived. The ASA threatened him, and he was not allowed to eat, drink, or use the bathroom. He consistently told the police, ASA, and grand jury that he did not see a firearm. He told a detective only that he heard about three shots and ran. On redirect examination, Bolden testified that, because the police officers were outside the courtroom, he told the grand jury he had not been threatened with a probation violation.

¶ 26    Detective Hickey testified that no one searched or threatened Bolden with a probation violation or for possessing marijuana. On February 10, 2014, he showed Bolden a photo array and Bolden identified defendant. Hickey did not transport Bolden to the courthouse for his grand jury hearing but did serve him a subpoena in the courthouse that day. On cross-examination, Hickey testified he sat in an office with Bolden and an ASA while they discussed the case before Bolden testified, and left during Bolden's testimony.

¶ 27    ASA Aileen Bhandari testified that she met with Bolden at the police station on February 11, 2014. Bolden agreed to speak with her and give a videotaped statement. She spoke with him privately and ensured he was there voluntarily and was able to eat and sleep. He stated he had been treated fairly.

¶ 28    The State published Bolden's videotaped statement. The video is included in the record on appeal and depicts Bolden telling Bhandari and Hickey that, while salting about two minutes before the shooting, he saw "Poo" and "Big Daddy" on the opposite side of the street from him and Hayes. Poo was on the phone. Bolden continued salting, then glanced back and saw Poo and Big Daddy had crossed the street. Hayes walked past Poo, and Poo raised his arm with his sleeve covering his hand, which Bolden demonstrates. Bolden heard a gunshot and saw Hayes fall. Bhandari asks him to identify Poo on a photograph with a "P," Big Daddy with a "B," and his mother with an "M." He confirms that he also identified Poo in a photo array. The police drove Bolden to the police station but he came voluntarily. They treated him well, gave him water, offered food, and he slept. He had not been forced to speak, or threatened, promised, or exchanged anything to speak.

¶ 29    ASA Pierina Infelise testified she met Bolden at the courthouse on March 13, 2014. Hickey was present, but she later inquired privately whether Bolden was comfortable speaking with her, if he was there voluntarily, and if he had been threatened or promised anything to testify. Bolden responded that he had been treated well and never expressed he had been mistreated or forced to speak. He then appeared before the grand jury. The transcript of Bolden's grand jury testimony was admitted into evidence and Infelise read portions of it.

¶ 30    The portion of the transcript that Infelise read included Bolden identifying "Poo," "Big Daddy," and his mother in a photograph of the crime scene before the shooting, and signing and dating the photo. It also included his testimony that Poo and Big Daddy crossed the street and approached Hayes, Poo raised his arm, Bolden heard a loud noise "[f]rom a gun" he could not see, and Hayes fell.

¶ 31    Bolden told the grand jury he agreed to give a videotaped statement and his answers during the videotaped statement were true and accurate. Bolden further told the grand jury that he took the bus to the hearing and testified freely and voluntarily. On cross-examination, Infelise testified that Hickey did not drive Bolden to the grand jury hearing, Bolden declined Hickey's offer to drive him home, and Hickey was gone when Bolden finished testifying.

¶ 32    Reuben Daniels testified that he lived near Hastings on February 9, 2014. He shoveled snow with Hayes and Bolden that day. Shortly before 4:15 p.m., Daniels was shoveling with his back to Hayes, who was 10 or 11 feet away. Daniels turned his head and saw two people near Hayes. He did not see their faces and continued shoveling. A second or two later, Daniels heard a sound like a firework. Two seconds after that, he turned and saw Hayes on the ground. Daniels heard someone say "run," and he ran. He did not see either of the two individuals who had been near Hayes in the courtroom.

¶ 33    Around 1:30 or 2 a.m. that night, detectives came to Daniels's home. He agreed to come to the police station. The detectives showed him a photo array, which he viewed for about 15 minutes without identifying anyone. One of the detectives said he could not leave until he identified someone, so Daniels "just picked somebody out." The detective said "no," grabbed the photographs, and left for about two hours. When he returned, he took Daniels to view an in-person

lineup. Daniels did not recognize anyone. Police returned him to the interview room for another hour. The detective returned with the photo array and Daniels identified a different photograph. The detective said "okay" and instructed him to sign the photo. The police treated him well.

¶ 34    On February 11, 2014, Daniels agreed to speak with an ASA at the police station. She asked about the photo array, and he told her he identified the person who approached Hayes moments before the fireworks sound. However, he did not actually recognize anyone. Daniels did not tell her that he initially identified someone else. He agreed to give a videotaped statement. He testified that in the videotaped statement, he identified the person from the photo array as speaking with Hayes before the shooting. Daniels did not remember stating he had been able to sleep and denied stating he heard a gunshot.

¶ 35    Footage of Daniels's videotaped statement was played in court but it was not admitted as an exhibit and is not included in the record on appeal. The State asked if he stated in the video he heard a gunshot, but Daniels responded he stated he heard a "firework." He acknowledged that he stated in the video that he (1) had been given food and water at the police station, (2) had been able to sleep, and (3) had not been promised or threatened into speaking.

¶ 36    Daniels subsequently admitted that he viewed the in-person lineup on February 14, 2014. He identified someone. The detectives stated the identification was incorrect, so he identified someone else. The second person was not in the courtroom.

¶ 37    The detectives drove him to a grand jury hearing. There, he identified the photo array in which he recognized one of the people speaking to Hayes. He testified to the grand jury that he picked out that person in the physical lineup.

¶ 38    On cross-examination, Daniels testified that he spoke to the prosecutors the day before trial. He told the prosecutors that, when he viewed the in-person lineup, he first identified the person on the opposite end from defendant. He did not see who shot Hayes.

¶ 39    Detective Hickey testified that, on February 10, 2014, Daniels agreed to accompany him to the police station, where he identified defendant in a photo array and signed defendant's photo. On February 11, an ASA met with Daniels at the police station and took his statement. On February 14, defendant was arrested and stood in a physical lineup. Daniels viewed the lineup and "immediately" identified defendant.

¶ 40    Hickey did not recall Daniels identifying anyone else in the lineup or the photo array. Hickey denied that he ever said "no" and made Daniels identify someone else, or that he removed the photo array and had Daniels view the photos again hours later. Hickey brought Daniels to and from the courthouse for his grand jury testimony and disagreed that was "unusual."

¶ 41    ASA Bhandari testified she interviewed Daniels on February 11, 2014, the same date she interviewed Bolden. Daniels gave a videotaped statement during which she presented him with a photo array he had previously viewed. He never indicated that he initially selected a different photograph than the one he had signed, or that the detective said "no" and showed him the photographs again hours later.

¶ 42    ASA Infelise testified that she met Daniels at the courthouse on February 25, 2014. She spoke with Daniels in Hickey's presence and then alone, and he indicated he had been treated well. Daniels then appeared before the grand jury. Daniels never indicated to Infelise or the grand jury that he identified multiple people in the physical lineup.

¶ 43    A video analyst for CHA testified that CHA employed motion-activated surveillance cameras around the area of the shooting. They did not always record every motion in front of them. He identified disks containing video footage from the cameras from February 9, 2014, and explained that the timestamps on the videos were approximately 15 minutes behind the actual time.

¶ 44    Detective Hickey testified he viewed videos taken by the CHA cameras in the area of the shooting. He identified the videos at trial and testified that, although the timestamps were incorrect, they depicted individuals in the area just before and after the shooting. The State published the video clips, which are included in the record on appeal, and Hickey narrated the persons and locations depicted.

¶ 45    From our review, the video clips depict Hayes, whom Hickey identified as wearing a gray hoodie, salting and shoveling in multiple places, along with persons whom Hickey identified as Bolden and Daniels. A clip time-stamped around 3:35 p.m. depicts the area shown in People's Exhibit No. 6, and Hickey identified Rice, Smith, and defendant. Hickey testified Smith is the person shown wearing tan pants and defendant is the person wearing jeans and a parka with fur. The parka is dark and its hood, which is down, is lined with brown fur. Another clip shows Smith and defendant in the same area, alone, around 3:50 p.m.

¶ 46    Video clips from several different cameras then show Smith and defendant walking around 3:55 and 3:56 p.m. One clip, time-stamped around 3:56:55, shows Smith—who raises his hand towards his ear as if he is speaking on the phone—walking on a sidewalk while defendant walks through a parking lot and then turns to walk parallel with Smith on another sidewalk. Hickey testified that the clip depicted them walking southbound towards Hastings and took place about a minute before the shooting.

¶ 47 Another clip, time-stamped 3:55:56, shows the scene of the shooting with no one present. The video then skips to 3:58:30. Hayes is visible lying on the sidewalk, and Smith crosses the street away from Hayes's body and runs towards the bottom of the screen. Another person in the top-left corner of the video runs in the opposite direction. That person faces away from the camera and appears to be wearing a dark hood. Hickey testified it was defendant. A person wearing a dark hood, which is up and appears to be fur-lined, is then depicted by another camera around 3:59:15 walking in the opposite direction that Smith and defendant had walked in the clips before the shooting. Hickey testified that person was defendant, in his parka, who had run east from the shooting and then turned to walk north. Finally, another camera shows a person running around 3:58:52 and another person limping around 4:00:07. Hickey testified those persons were Bolden and Daniels, coming from Hastings.

¶ 48 Hickey further testified that, on February 14, 2014, he showed defendant a photograph of the crime scene before the shooting. Defendant identified himself as wearing blue jeans and a parka with fur but did not mark the photograph. Hickey identified the photograph at trial and placed an "X" over the person whom defendant identified. The photograph is included in the record on appeal, and the person with an "X" above their head is the person with the fur hooded-parka whom other witnesses had identified as defendant.

¶ 49 Following closing arguments, the jury found defendant guilty of first degree murder and made the additional finding that he personally discharged a firearm that proximately caused another's death. The court denied defendant's motion for a new trial. Following a hearing, the court merged count II into count I, and sentenced defendant to 22 years' imprisonment on first degree murder on count I. The court further stated it was merging count VI into count V, but then

sentenced defendant to a consecutive term of 25 years' imprisonment on first degree murder on count VI for the "personal discharge." Defendant did not file a motion to reconsider his sentence and does not challenge any aspect of his sentence on appeal.

¶ 50    On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt because, at trial, Smith, Bolden, and Daniels recanted their prior statements implicating him as the shooter. Defendant does not contest the admissibility of Smith, Bolden, and Daniels's prior statements.

¶ 51    Where a defendant challenges the sufficiency of the evidence at trial, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The factfinder is responsible for weighing the evidence, resolving conflicts in the testimony, and drawing reasonable inferences from the facts. *People v. Gray*, 2017 IL 120958, ¶ 35. Thus, although the factfinder's credibility determinations are not binding, we are not to retry the defendant or substitute our judgment for the factfinder's on questions involving the evidence's weight or the witnesses' credibility. *Id.* We will reverse a conviction only where "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 52    "This standard applies to all evidence, including prior inconsistent statements." *People v. Williams*, 332 Ill. App. 3d 693, 696 (2002). Prior inconsistent statements may be admitted as substantive evidence if they meet the admissibility requirements in section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2018)). *People v. Ware*, 2019 IL App

(1st) 160989, ¶ 34. That section makes admissible a witness's prior statement if the statement is inconsistent with his testimony at trial, he is subject to cross-examination about the statement, and the statement (1) was made under oath, or (2) describes an event of which he had personal knowledge and, *inter alia*, the statement was accurately recorded or he acknowledges under oath he made the statement. 725 ILCS 5/115-10.1 (West 2018).

¶ 53     A conviction may rest solely on a prior inconsistent statement, even if the statement is uncorroborated by other evidence. *Williams*, 332 Ill. App. 3d at 696; *People v. Morrow*, 303 Ill. App. 3d 671, 677 (1999) ("Assuming *arguendo* that there was no corroborative evidence, it does not necessarily portend that, as a matter of law, a recanted prior inconsistent statement admitted under section 115-10.1 cannot support a conviction."). Further, when a statement is admitted under section 115-10.1, "a finding of reliability and voluntariness is automatically made." (Internal quotation marks omitted.) *Morrow*, 303 Ill. App. 3d at 677.

¶ 54     When the factfinder is presented with conflicting statements, the factfinder weighs them and determines which is more credible. *Williams*, 332 Ill. App. 3d at 696-97. As we stated in *Morrow*:

> "[I]t is the jury's decision to assign weight to the statement and to decide if the statement was indeed voluntary, after hearing the declarant's inconsistent testimony. [Citations]. Once a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was substantially corroborated or clear and convincing, but it may *not* engage in any such analysis." (Emphasis in original and internal quotation marks omitted.) *Morrow*, 303 Ill. App. 3d at 677.

¶ 55    Here, to prove defendant's guilt, the State was required to show that he intentionally or knowingly shot and killed Hayes (count I) (720 ILCS 5/9-1(a)(1) (West 2014)), and shot and killed Hayes while knowing the act created a strong probability of death or great bodily harm and personally discharged a firearm that proximately caused death in committing the offense (count VI) (720 ILCS 5/9-1(a)(2) (West 2014)).

¶ 56    After reviewing the record in the light most favorable to the State, we conclude that there was sufficient evidence for a rational factfinder to find defendant guilty. The record shows that Hayes died by homicide from gunshot wounds to his head and torso. Smith gave a videotaped statement in which he stated that he saw defendant shoot Hayes with a firearm hidden in his sleeve. *Ware*, 2019 IL App (1st) 160989, ¶ 34 (prior inconsistent statements meeting the test of section 115-10.1 may be admitted as substantive evidence).

¶ 57    Smith identified defendant in a still frame from a surveillance camera as the person wearing a fur hood shortly before the shooting. Bolden, Booker, and Rice also identified defendant as that person, as did—according to Hickey—defendant himself. The video clips show Smith and defendant walking together just before the shooting, and Hickey testified that they were walking in the direction of the shooting. The clips then show Smith and a hooded person whom Hickey testified was defendant running away from Hayes's body.

¶ 58    In Bolden's videotaped statement and grand jury testimony, he stated that he saw defendant raise his arm while standing near Hayes, and then he heard a gunshot and saw Hayes fall. He identified defendant in a photo array. Daniels acknowledged that, in his videotaped statement and grand jury testimony, he stated that he saw a person speaking to Hayes just before Hayes was shot, and identified that person in a photo array. Hickey testified that Daniels identified defendant.

¶ 59 Moreover, the video clips, which were published for the jury, showed a hooded figure whom Hickey identified as defendant running in the opposite direction of Smith while Hayes's body lay on the sidewalk. Given all this evidence, a rational factfinder could conclude that defendant (1) intentionally or knowingly shot and killed Hayes and (2) shot and killed Hayes knowing that the act created a strong probability of death and personally discharged the firearm that proximately caused Hayes's death. *People v. Armstrong*, 2013 IL App (3d) 110388, ¶¶ 23-25 (substantively admitted prior inconsistent statements alone are sufficient to prove a defendant's guilt beyond a reasonable doubt).

¶ 60 Nevertheless, defendant argues that Smith, Bolden, and Daniels not only recanted their prior statements at trial, citing coercion and duress by police officers, but the statements were uncorroborated by other evidence. Thus, he contends the statements are incredible and insufficient to sustain his guilt.

¶ 61 Again, defendant does not dispute that Smith, Bolden, and Daniels's prior inconsistent statements were properly admitted as substantive evidence at trial. Thus, those statements are "automatically" deemed reliable and voluntary. (Internal quotation marks omitted.) *Morrow*, 303 Ill. App. 3d at 677. Further, it was for the jury to weigh Smith, Bolden, and Daniels's testimonies that their prior statements were the result of threats and coercion against the testimonies of Hickey and the ASAs demonstrating the video and grand jury statements were not made under duress or threat to determine which was more credible. *Williams*, 332 Ill. App. 3d at 696-97. As the trier of fact, the jury was free to accept as much or as little of a witness's testimony as it pleased (*People v. Sullivan*, 366 Ill. App. 3d 770, 782 (2006)), and we must defer to its apparent determination that

Smith, Bolden, and Daniels's prior inconsistent statements were more credible than their testimony at trial (*Gray*, 2017 IL 120958, ¶ 35).

¶ 62    Defendant argues that the videos of the crime scene do not corroborate Smith, Bolden, and Daniels's identification of him as the shooter. He contends that it is impossible to discern the identity of the person running towards the top of the screen while Smith runs towards the bottom and Hayes's body is on the sidewalk. The jury viewed the videos and photographs from that day in which multiple witnesses identified defendant by his clothing. It was the jury's responsibility to weigh the video evidence and decide whether it was defendant who is depicted running away from Hayes's body. *Id.* More crucially, no corroboration was required, as even without corroborative evidence, a recanted prior inconsistent statement admitted under section 115-10.1 can support a conviction. *Armstrong*, 2013 IL App (3d) 110388, ¶ 23. Thus we are not compelled to reverse defendant's convictions even if the witnesses' prior inconsistent statements are not corroborated by the video. See *People v. Davis*, 2018 IL App (1st) 152413, ¶ 48 ("The fact the witnesses recanted their identifications at trial and the convictions rest primarily on the witnesses' properly admitted prior inconsistent statements without corroboration does not warrant reversal.").

¶ 63    Ultimately, as the jury found defendant guilty, it necessarily determined that Smith, Bolden, and Daniels were truthful in their prior inconsistent statements and untruthful at trial. Defendant identifies no justification in the record for us to substitute our judgment for the jury's credibility determination. Accordingly, the evidence was sufficient for the jury to find defendant guilty of first degree murder and personal discharge of a firearm. We affirm.

¶ 64    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 65    Affirmed.